
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 3, 2018

## MARQUEZ WILLIAMS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 11-06687     James M. Lammey, Judge
_____

### No. W2017-01175-CCA-R3-PC
_____

The petitioner, Marquez Williams, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and ROBERT L. HOLLOWAY, JR., JJ., joined.

Ernest J. Beasley, Memphis, Tennessee, for the appellant, Marquez Williams.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Glen Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

#### A. Trial Proceedings and Direct Appeal

The petitioner was convicted of aggravated robbery for which he received a sentence of 11 years in the Department of Correction. The petitioner subsequently challenged the sufficiency of the evidence supporting his conviction and the sentence imposed on direct appeal. This Court summarized the underlying facts leading to the petitioner's conviction, as follows:

This case stems from the armed robbery of a pizza delivery driver in Memphis. At trial, Maurice Steele ("the victim") testified that he moved to

Memphis in November 2010, after completing military service in Fort Hood, Texas. After moving, he was employed by Domino's Pizza as a delivery driver. The victim recalled that around midnight on May 24, 2011, he received a call to deliver an order of two large pizzas and a two liter bottle of Sprite to a house on Patte Ann Drive. When he arrived at the location, the victim did not see anyone, and it did not appear that anyone was at the residence. The victim parked his car on the street in front of the house and walked up the driveway carrying his pizza delivery bag. About halfway up the driveway, the victim was approached from behind by two men, who yelled for him to "stop right there." When the victim turned around, the men demanded the pizza order and the victim's money.

The victim testified that both assailants appeared to be young, African-American men. He recalled that the first man had on a dark hoodie with a purple bandana "underneath his nose down" and either dark blue or black jeans and the second man wore a light-colored hoodie and white bandana over his nose and the bottom of his face. The first man was holding a Beretta 9mm pistol -- the same type of gun the victim used in the military. The victim also noticed that the front site post on the assailant's gun was orange in color. The victim testified that, when he realized that he was being robbed, he was shocked and afraid.

The victim recalled that the man with the gun grabbed the delivery bag out of his hands and then demanded cash. The victim denied having any money, but the assailant made him empty his pockets and took $90 from the victim. The assailant then asked the victim if there was anything else in his car. After the victim assured him there was not, the assailant instructed the victim to get in the car and leave. The victim testified that once he got into his car, it sounded like the assailant fired the weapon into the air. The victim drove away, and once around a corner, he called police and the pizza store.

The victim identified the [petitioner] as the assailant with the gun. He explained that although it was dark outside, he was able to see the [petitioner]'s face by the lights from an elementary school across the street. The victim additionally stated that there was a motion sensor light on at the house next door.

A couple of days after the robbery, the police asked the victim to view a photo lineup. In this photo spread of six pictures, the victim was unable to identify anyone. A few days later, the victim returned to the

police station to look at a second photo lineup. Before looking at the photo spread, he was instructed not to pick out anyone unless he was 100 percent sure of the identification. The victim testified that he looked carefully at the pictures and took his time to "make sure that [he] was picking the correct person." When looking at the photographs, the victim used a piece of paper to cover the bottom half of the faces so that he could focus on the top portion of the individuals' faces. After looking at the photos, the victim picked out the [petitioner]'s picture and circled it. He also wrote on the bottom of the photo spread, "[The petitioner] was the first man with the gun. He pulled the gun on me and demanded the pizza order and the money I had. After I gave him what he wanted, he told me to drive off." The victim then signed and dated the form.

The victim testified that he was 100 percent sure that the [petitioner] was one of the men who had robbed him. The victim explained that he observed the [petitioner] for "a minute or so" during the robbery and he was able to positively identify the [petitioner] based upon a scar above the [petitioner]'s eyebrow, the spacing of his eyes, and the size of the [petitioner]'s nose. During trial, the victim pointed out to the jury where on the [petitioner] he had seen the scar.

On cross-examination, the victim explained that, at the preliminary hearing, the [petitioner]'s attorney asked him if the gunman's bandana was "about midway of the nose," and he replied, "yes, about." He also acknowledged that, during the same hearing, he testified that the gunman had a scar going through his eyebrow. The victim explained that he meant that the suspect had a scar above the eyebrow and he did not intend to say that the scar went through the eyebrow.

Kevin Ware testified that on May 24, 2011, he, the [petitioner], and three other individuals -- Nakia Jackson, D'Jarvis Parker, and the [petitioner]'s brother, Marquell Wade -- planned to rob the delivery driver from Domino's Pizza in order to obtain money to buy drugs. Mr. Ware explained that the group began planning the robbery about 10:00 p.m. while on Patte Ann Drive, a street by Graceland Elementary School. Ms. Jackson used Mr. Ware's cell phone to call Domino's and place an order for two pizzas and soda to be delivered to a house on Patte Ann Drive. Mr. Ware explained that the group picked the address for the delivery because it did not appear that anyone lived there. Mr. Ware testified that the [petitioner] had a black, 9 millimeter gun with an orange site on it and, when the delivery person arrived, the [petitioner] was supposed to take the pizza and

the driver's money. Mr. Ware was supposed to be the look-out during the robbery and warn the [petitioner] if he saw police.

After Ms. Jackson placed the order, the group sat in a park across from the house where the pizza was to be delivered and waited because they did not want to be seen at the house. While sitting at the park, a car pulled up, shining its lights towards the group. Afraid that it might be the police, the group ran to Mr. Parker's house. However, the [petitioner] and Ms. Jackson eventually returned to the house on Patte Ann Drive.

The [petitioner] and Ms. Jackson later returned to Mr. Parker's house with pizza and soda, and the group ate the pizza behind a house. Mr. Ware said he did not see any cash. The [petitioner] told Mr. Ware that, when the victim pulled up, he made the victim give him the pizza and then told the victim to get in his car and leave. The [petitioner] also said that he shot his pistol into the air before the victim drove off.

Mr. Ware recalled that, at the time of the robbery, the [petitioner] was wearing dark clothes, including a black shirt and blue shorts, while Ms. Jackson was wearing white shorts and a white shirt. Mr. Ware testified that, before the robbery, he saw the [petitioner] and Ms. Jackson put on bandanas as masks. He believed that one bandana was white and one was red. Mr. Ware also confirmed that he heard a gunshot around the time of the robbery.

Mr. Ware admitted that he pled guilty to aggravated robbery in connection with the offense. Mr. Ware stated that he had talked to police about the robbery with the hope that it would help him out, but he denied that he had a deal with the State in exchange for his testimony.

On cross-examination, Mr. Ware acknowledged that he did not tell the police that he heard a gunshot on the night of the robbery or that the [petitioner] told him about the robbery when it was over. Mr. Ware agreed that, after his arrest, police told him that he was looking at a lot of charges and that it could help his situation if he talked to them.

On redirect, Mr. Ware explained that before he gave his statement to authorities, the police had discovered that the Domino's Pizza order was placed from Mr. Ware's cell phone. Mr. Ware stated that he had thought it might be to his advantage at that point to tell the police the truth about what had happened.

Sergeant Albert Bonner of the Memphis Police Department testified that after he was assigned to investigate the robbery that occurred on Patte Ann Drive, he contacted Domino's Pizza and obtained the phone number of the caller who had placed the delivery order to that location. Sergeant Bonner explained that the phone number belonged to a relative of Mr. Ware and, based upon this information, Mr. Ware became a suspect.

Sergeant Bonner brought Mr. Ware to the police department to talk to him about the offense. Sergeant Bonner acknowledged telling Mr. Ware that, if he cooperated, he would talk to prosecutors to let them know he cooperated. He told Mr. Ware that it could help him "down the road," but he denied making any promises to him. After speaking with his mother, Mr. Ware decided to give a statement to Sergeant Bonner about the offense. Sergeant Bonner explained, "[Mr. Ware] advised us that he, along with others, had planned to rob the pizza man and once the pizza man got there they were going to take the pizza, go back to a different location and they were going to eat the food at that time." Mr. Ware told the sergeant that the [petitioner], Ms. Jackson, Mr. Parker, and Mr. Wade had also been involved in the robbery. After developing Mr. Ware as a suspect, Sergeant Bonner prepared a photo lineup to show the victim, which included Mr. Ware's photograph. However, the victim was unable to make a positive identification from this first photo array.

Sergeant Bonner testified that he also interviewed the [petitioner] about his involvement in the offense. After being read his *Miranda* warnings, the [petitioner] signed an advice of rights form and indicated that he wanted to talk to Sergeant Bonner. According to Sergeant Bonner, the [petitioner] made several inconsistent statements during the interview. For example, the [petitioner] knew all of the details of the robbery but claimed that he did not participate in it and was not there. Nonetheless, the [petitioner] admitted that he ate some of the food taken during the robbery. The [petitioner] claimed he was at his girlfriend's house at the time of the robbery, and he received a phone call from Mr. Ware, Ms. Jackson, and Mr. Parker after the robbery had taken place. After hearing that the group had committed a robbery, the [petitioner] told his girlfriend about the robbery and decided to meet up with the group. The [petitioner] claimed that, when he got to the group's location, "everyone was just talking about what happened" and that was how he learned the details of the robbery.

Sergeant Bonner testified that he followed up on the [petitioner]'s statement by talking to the [petitioner]'s girlfriend. The [petitioner]'s girlfriend stated that "she did not know what [the petitioner] was talking about, that he did not tell her anything about a robbery." Sergeant Bonner then placed the [petitioner]'s photograph in a lineup for the victim to view. Before showing the photo spread to the victim, Sergeant Bonner told the victim to take his time and that the person who robbed him may or may not be in the lineup. Because the suspects had worn bandanas over parts of their faces, Sergeant Bonner also told the victim that he could take a blank sheet of paper and put it across the bottom of the faces while looking at them. The victim identified the [petitioner] and circled his picture. Sergeant Bonner then had the victim write down "what that person did to him" at the bottom of the lineup.

On cross-examination, Sergeant Bonner testified that the victim estimated the first assailant's height as five-nine or five-ten. The arresting officer listed the [petitioner]'s height as five-seven, which the officer likely obtained from the [petitioner]'s driver's license. Sergeant Bonner recalled that the victim also told him that the first assailant had "something above the eyebrow, a discoloration or something" but could not recall if the victim said it was a scar. Sergeant Bonner explained that he placed the [petitioner]'s photograph in the lineup based upon both Mr. Ware and Mr. Wade telling him that the [petitioner] was involved in the robbery. After selecting the [petitioner] in the photo lineup, the victim told Sergeant Bonner that he was "pretty sure" of the identification. Based upon this testimony, the jury convicted the [petitioner] of aggravated robbery.

*State v. Marquez Williams*, No. W2013-02764-CCA-R3-CD, 2015 WL 12978633, at *1-4 (Tenn. Crim. App. Jan. 27, 2015) *no perm. app. filed*. After its review, this Court affirmed the petitioner's conviction and sentence. *Id.* at *8.

## B. Post-Conviction Proceedings

The petitioner timely filed a *pro se* petition for post-conviction relief, alleging, among other things, trial counsel was ineffective for failing to call an alibi witness and that he was "not properly informed about the amount of evidence the State had against him. . . ." Following the appointment of counsel, the post-conviction court held a hearing on the motion, during which only the petitioner and trial counsel testified.

Trial counsel testified that he has been licensed to practice law since 2010. At the time of the petitioner's trial, trial counsel was associated with the attorney originally

hired by the petitioner. Initial counsel asked trial counsel to help with the petitioner's case, and as initial counsel dealt with some health issues, trial counsel became even more involved in the petitioner's case. According to trial counsel, the petitioner was free on bond pending trial, and trial counsel, as well as initial counsel, met with the petitioner and his grandmother several times at trial counsel's office. Trial counsel also stated that the State offered the petitioner a plea deal with a sentence of eight or nine years.

Trial counsel acknowledged he was aware of a potential alibi witness, Sherrie Walker. Ms. Walker was the petitioner's girlfriend at the time and claimed the petitioner was with her all day the day of the robbery. However, Ms. Walker refused to come to trial counsel's office to meet with him. Additionally, Ms. Walker's story did not match completely with the petitioner's version, and trial counsel feared putting her on the stand and allowing the State to question her about the "gaps" in her timeline.

When questioned about discovery in the petitioner's case, trial counsel testified they filed a motion for and received discovery from the State. He also noted the petitioner would have been provided a copy of discovery if he had requested such.

On cross-examination, trial counsel testified that the petitioner was present for a preliminary hearing. According to the proof, the petitioner was the gunman in the robbery, and Kevin Ware was the lookout. Mr. Ware testified at trial as a witness for the State, and trial counsel was able to cross-examine him about inconsistencies between his statement to police and his trial testimony. Additionally, the victim, while unsure initially, identified the petitioner as the individual who robbed him.

According to trial counsel, the petitioner's defense was that he was not present during the robbery and only knew details of the robbery because his brother, who was involved, told him about the robbery.

The petitioner testified he hired initial counsel and was never told that trial counsel would be taking over his case. He also stated that he requested a copy of the discovery provided by the State, but his attorneys would not allow him to have a copy. He was unaware the victim identified him as the gunman and never saw the "police affidavit." Thus, the petitioner had no idea about the strength of the State's case when he rejected the State's nine-year plea offer. Had he been better informed, the petitioner would have accepted the State's plea offer.

On cross-examination, the petitioner maintained he did not participate in the robbery and only knew some of the details because his brother shared them with him. Despite his claim that he did not receive discovery or know the extent of the evidence against him, the petitioner admitted trial counsel discussed the case with him and that he

met with trial counsel several times. When asked directly what trial counsel could or should have done differently to make sure he was fully advised about his case, the petitioner responded, "Um-hum – somethin' – I don't know." When asked to "tell the court how your lawyers did not do their job," the petitioner simply stated, "I believe that they could have gave me – I could have got a lesser sentence." The petitioner, however, did not explain what trial counsel should have done to accomplish this goal.

At the conclusion of the hearing, the post-conviction court denied the petition stating,

> Well, I agree with the State. I haven't seen any proof of deficient performance at all, not at all. As a matter of fact, remembering the case, I remember how good a job [trial counsel] did in this. And apparently [initial counsel] as well. He managed to have the bond reduced where he could get out and assist in his defense. It was reduced from seventy-five to thirty thousand dollars on March 20 of [20]12; and then the case wasn't tried until -- it looks like September of [20]13, so I don't see any -- I don't know how -- he says, "Well, I didn't receive discovery." Well, I don't believe that.

> You know, I don't find him to be credible at all. If he'd wanted discovery, I'm sure they would have given it to him, and he probably did. But assuming they didn't actually hand him discovery, he knew exactly what was going on here -- he knew exactly what he was charged with. He went through a preliminary hearing. He went through a bond hearing. And when he set the case for trial, he turned down the nine-year offer and set it for trial. And he knew exactly what he was doing.

> So, being that there was no deficient performance, how could there be prejudice? I still haven't heard. He said, "Well, I could have got a better offer." I don't know -- I don't know if I would have taken the offer. Who knows. I mean, hindsight is twenty/twenty, I guess.

> And [trial counsel] also managed to make sure that he didn't get the maximum. I could have given him twelve years at eighty-five percent rather than eleven. I haven't seen any prejudice whatsoever.

> I find [trial counsel's] testimony very credible, whereas I find [the petitioner's] testimony incredulous, and you may step out. I'm going to show [the petition] denied.

This timely appeal followed.

# ANALYSIS

On appeal, the petitioner asserts the outcome of his case would have been different absent the deficiencies of trial counsel. The petitioner argues trial counsel was ineffective for failing to call an alibi witness known to trial counsel and that he would have pled guilty had he been fully informed about the strength of the State's case. The State contends the petitioner has failed to establish either allegation and is, therefore, not entitled to relief. Following our review of the record and submissions of the parties, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *See id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Initially, the petitioner contends that trial counsel was ineffective for failing to call the petitioner's girlfriend, Sherrie Walker, as an alibi witness. We note, however, that the petitioner failed to call his alleged alibi witness during the post-conviction hearing. When a petitioner contends trial counsel failed to discover, interview, or present witnesses in support of his defense, the petitioner must call those witnesses to testify at an evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This is the only way the petitioner can establish that:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of [p]etitioner.

*Id*. Even if a petitioner is able to show counsel was deficient in the investigation of the facts or the calling of a known witness, the petitioner is not entitled to post-conviction relief unless he produces a material witness at his post-conviction evidentiary hearing who "could have been found by a reasonable investigation" and "would have testified

favorably in support of his defense if called." *Id.* at 758. Without doing this, the petitioner cannot establish the prejudice requirement of the two-prong *Strickland* test. *Id.*

Other than the petitioner's own testimony, which the post-conviction court found not credible, the petitioner failed to call Ms. Walker or offer any proof regarding what she would have testified to had she been called at trial. Moreover, trial counsel testified that Ms. Walker refused to meet with him prior to trial and that they were concerned about putting her on the stand because her timeline did not match that of the petitioner's for the day of the robbery. This Court will not reweigh the credibility determinations of the post-conviction court, nor will it second guess the tactical and strategic decisions of trial counsel made after adequate trial preparation. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). The petitioner has failed to carry his burden of proving trial counsel's failure to call Ms. Walker as an alibi witness prejudiced the outcome of his trial and, therefore, is not entitled to post-conviction relief.

The petitioner's final claim on appeal is that counsel was ineffective for failing to sufficiently advise him of the strength of the State's case. He argues had he been fully advised of what he was facing at trial he would have accepted the State's plea offer. However, as noted by the State, the petitioner failed to offer an explanation of trial counsel's deficiencies other than state, "Um-hum – somethin' – I don't know" and "I believe that they could have gave me – I could have got a lesser sentence." The petitioner did, however, corroborate trial counsel's testimony that trial counsel met with the petitioner and discussed the case with him. Trial counsel also testified he was provided with discovery from the State and would have provided the petitioner with a copy of the discovery if he requested it. Finally, the post-conviction court, in addition to accrediting the testimony of trial counsel, noted that the petitioner was present for the bond hearing as well as a preliminary hearing and, thus, the petitioner "knew exactly what he was doing."

Based on the proof presented, we affirm the post-conviction court's determination that the petitioner failed to meet his burden of proof and is not entitled to relief. Accordingly, the petitioner is not entitled to relief.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE